Mary COOK, on Behalf of Charles COOK, Plaintiff,

v.

Louis M. SULLIVAN, Secretary of Dept. of Health and Human Services, Defendant.

No. 92–4003.

United States District Court, C.D. Illinois.

Jan. 26, 1993.

John A. Bowman, Wells, McNally & Bowman, Davenport, IA, for plaintiff.

K. Tate Chambers, Asst. U.S. Atty., Peoria, IL, for defendant.

## ORDER

McDADE, District Judge.

Before the Court is Plaintiff's Motion for Summary Reversal (# 7) and Defendant's Motion to Affirm (# 10) the Secretary's decision to deny Plaintiff's application for disability income benefits.

## BACKGROUND

Plaintiff seeks review of the Administrative Law Judge's (ALJ) denial of Plaintiff's application for disability income benefits (DIB) pursuant to the Social Security Act (Act), 42 U.S.C. §§ 416(i), 423, and 1381a. On July 21, 1988, Plaintiff applied for benefits alleging that he became disabled on July 11, 1985, due to back problems. (A.R. 229–232). His claim was denied initially and on reconsideration. (A.R. 234–236, 241–242).

Plaintiff died on September 22, 1989, due to an acute myocardial infarction. (A.R. 369). A de novo hearing was subsequently held before the ALJ at which Plaintiff's widow appeared and testified. (A.R. 74–99). The specific issue before the ALJ was "whether the claimant was disabled within the meaning of the [Act] at any time between June 30, 1988, and September 22, 1989, the date of his death." (A.R. 16). On May 15, 1990, the ALJ found that Plaintiff was not disabled during the relevant time period. (A.R. 15–25). Subsequently, Plaintiff filed this action for review of the Secretary's decision.

Plaintiff was born on May 3, 1931, and was 57 years old on the date of the hearing, June 7, 1988. (A.R. 36). He was 58 years old on the date of his death.

Plaintiff was educated in a one-room school in rural Arkansas. He completed eight years of school and part of a ninth year. (A.R. 37). However, Plaintiff missed a lot of school because he was frequently required to help his mother and father on their farm. According to Plaintiff's wife, Plaintiff's school attendance "was very poor." (A.R. 79).

Plaintiff's lack of education was elaborated upon by his wife who testified that he was a poor reader who took "forever" to read a paper and usually relied upon his wife to tell him what was in the paper. (A.R. 83). Plaintiff's wife also testified that her son, who suffered from Downs Syndrome and read at a 3.8 grade level, had better reading and comprehension skills than Plaintiff. (A.R. 83–84). Plaintiff's wife testified that she took care of all of the family paperwork such as tax preparations, letter writing, filling out social security forms, and all other family business. She testified that Plaintiff probably never wrote a check and that he never read a book. (A.R. 84). She testified that Plaintiff "mainly [looked] at the newspaper" and that he was confused by common punctuation marks. (A.R. 84–85). Plaintiff's wife also testified that there were many words which Plaintiff heard on news broadcasts of which he did not know the meaning. (A.R. 85).

Regarding Plaintiff's work history, Plaintiff worked as a sharecropper with his father in Arkansas until he was 18 years old. Subsequently, in June of 1949, Plaintiff began working for John Deere in Iowa, where he stayed until 1952. From 1952 to 1954, Plaintiff served in the United States Army, and he saw action in the Korean War as a combat engineer. (A.R. 80). After the war, Plaintiff returned to John Deere, staying there until 1957. From 1957 through 1963, Plaintiff worked on a dairy farm in Wisconsin where he milked cows, plowed fields, and harvested crops. (A.R. 81). In 1964, Plaintiff began his final and longest career as an over-the-road trucker for General Cartage. Plaintiff held this position until July of 1985 when he stopped working after injuring himself in a fall at work. (A.R. 40).

While a truck driver, Plaintiff was occasionally required to lift 50 to 100 pounds. In addition to the lifting, Plaintiff was also required to do a minimal amount of simple paperwork. Plaintiff kept track of the hours he worked by drawing a line through numbers which represented clock hours. Thus, if Plaintiff worked from 1 to 4 in the afternoon, he would draw a line through the numbers 1 through 4. (A.R. 83). Plaintiff also had someone sign a delivery paper at a delivery site, but he did not do any paperwork involving invoices or bills of lading. (A.R. 57, 83).

In 1983, prior to Plaintiff's injury and while he was still working for General Cartage, Plaintiff underwent heart by-pass surgery. After his surgery, Plaintiff returned to work and resumed duties similar to those which he performed prior to his surgery. (A.R. 41–42).

Plaintiff experienced extremely sharp pain in his back shoulders, arms, and chest after his surgery. The pain could last all day for several consecutive days. (A.R. 58). The chest pain was apparently caused from the surgery incision and resulting scar tissue and was not related to heart problems. According to Plaintiff, his doctors had told him that his heart was "pretty good." (A.R. 62). Dr. Gilson reported that Plaintiff did not take cardiac medication and that he had no cardiac complications related to his surgery. (A.R. 324).

Though Dr. Gilson did not believe that Plaintiff's cardiac condition did not require disability, he did report that Plaintiff had a "severe injury problem related to a fall and spinal injury." (A.R. 324). Dr. Gilson was referring to the fall Plaintiff suffered at work and, on August 17, 1988, Dr. Gilson noted the following:

On 7/11/85 he [Plaintiff] fell backward 10 feet from a cab of a truck. He landed on the ground striking the left side of his body, as well as, his back and head. [sic] He fractured some ribs and injured his spine. He has not been able to work since that time. He has significant pain related to that injury. He's unable to twist his torso more than 30 degrees. He's unable to touch his toes and is unable to flex, extend, rotate his spine more than 30 degrees in any direction. He is unable to lie down flat. (A.R. 324).

As a result of the fall, Plaintiff experienced pain in his back, arms, and shoulders. He also experienced pain in his right leg and numbness in his right foot. (A.R. 42). Plaintiff sought relief from the pain by having his wife pound him on the back with her fist or a wooden meat tenderizer. (A.R. 43). Plaintiff also took Darvocet, Tylenol, and Valium for the pain. (A.R. 43–44).

In 1988, Dr. Chesser began treating Plaintiff for his back pain. Dr. Chesser believed that the pain resulted from reflex tension myalgia and not from the fall. (A.R. 319). Dr. Chesser noted that Plaintiff's ability to do work related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, and traveling was extremely limited. (A.R. 321).

On August 15, 1988, Plaintiff underwent a series of x-rays. A study of Plaintiff's cervical spine x-rays revealed moderate degenerative changes with probable discogenic disease and narrowing of the neural canal. Thoracic spine x-rays revealed moderate degenerative changes in the lower thoracic spine with extensive osteophyte formation and a moderate bone osteopenia. Lumbar spine x-rays showed mild osteophyte formation at all levels of the lumbar spine. (A.R. 323).

In September of 1988, Dr. Chesser noted that physical therapy aggravated Plaintiff's pain and that he should begin taking Elavil to treat his chronic pain. (A.R. 332). Later, in October of 1988, Dr. Chesser noted that the Elavil had no effect in alleviating Plaintiff's pain. (A.R. 335). In December of 1988, Charles Andrews, D.O., noted that Plaintiff had "considerable tenderness to palpitation of the paravertebral musculature of his dorsal spine with no real localization but generally from the upper thoracic down through the thoracolumbar junction." (A.R. 336). Dr. Andrews noted that Plaintiff had a somatic dysfunction of the cervical and thoracic spine with underlying

degenerative arthritis. Dr. Andrew's treatments were unable to alleviate Plaintiff's pain for more than a 24 hour period. (A.R. 336).

In January of 1989, Steven Kanner, D.O. examined Plaintiff and reported that Plaintiff's back pain:

[I]s a source of great disability and, in watching the patient, this patient was having much pain when I positioned him in different fashions. I truly believe he has chronic low back syndrome with chronic pain. Despite the fact that there is a paucity of physical examination findings other that decreased range of motion of his thoracolumbar spine, I feel he is truly suffering from chronic pain.

(A.R. 341).

On September 22, 1989, Plaintiff died of an acute myocardial infarction as a consequence of coronary artery disease. (A.R. 369).

### THE ALJ'S FINDINGS

The ALJ found that the Plaintiff did not retain the functional capacity between June 30, 1988 and September 22, 1989, to lift or carry weight above the light exertional level, perform work requiring repetitive pushing or pulling of weight as well as continuous stooping, twisting, or squatting, or perform work in temperature or humidity extremes. Accordingly, the ALJ found that Plaintiff was unable to perform his past relevant work as a truck driver from June 30, 1988 to September 22, 1989. (A.R. 21.).

At the hearing, the ALJ asked the vocational expert if an individual meeting Plaintiff's description regarding abilities, limitations, and education could perform any work using the skills acquired from his past work as a truck driver. (A.R. 68). The vocational expert stated that Plaintiff could work in semi-skilled jobs such as a hotel/motel clerk, which would require the registration of guests, sorting and racking of incoming mail, keeping records of room availability, computation of bills, and collection of payments. The vocational expert also stated that Plaintiff could perform the job of an order clerk which requires a person to process orders for materials and merchandise by mail, telephone or in person, inform customers of prices, shipping dates, and compute costs. (A.R. 69–70). The vocational expert noted that someone with a limited education might have a problem with the jobs because they involved computations of costs, decimals, and percentages. (A.R. 72). The vocational expert stated, however, that someone functioning at a 7th grade level, though not necessarily someone who had attended the 7th grade, should be able to do the necessary math. (A.R. 72).

Upon review of the evidence, the ALJ found that Plaintiff had a "limited" education, which is defined as at least a 7th grade education under the regulations. (A.R. 22). See 20 C.F.R. § 404.1564(b)(3). In support of his conclusion, the ALJ stated that: "Extensive testimony was submitted at hearing alleging that the [Plaintiff], although completing at least the eighth grade, was significantly restricted in his ability to read and write." (A.R. 22). Nonetheless, the ALJ found that Plaintiff possessed a "limited" education because "a log book and trip sheets were involved" in his job as a truck driver. (A.R. 22).

Accordingly, the ALJ found that:

When considering the claimant's age, education, previous work experience, and residual functional capacity between June 30, 1988, and September 22, 1989, jobs still were present in significant numbers in the national economy that he could perform. Examples of such jobs are: Hotel/motel clerk and order clerk.

(A.R. 25).

Consequently, the ALJ determined that Plaintiff was not under a disability, as defined by the Act, during the relevant dates. (A.R. 25).

### STANDARD OF REVIEW

 To be entitled to disability benefits, Plaintiff must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether Plaintiff is eligible for

benefits. *See,* 20 C.F.R. §§ 404.1566, 416.-966.

▪ The establishment of disability under the Act is a two-step process. First, Plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a determination that the impairment renders Plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano,* 614 F.2d 142, 143 (7th Cir.1980). That factual determination is made by using a five-step test. *See,* 20 C.F.R. §§ 404.1521, 416.921).

▪ The five-step test is examined by the ALJ as follows: (1) Is the plaintiff presently unemployed?; (2) Is the plaintiff's impairment "severe"? 20 C.F.R. §§ 404.1521, 416.921; (3) Does the impairment meet or exceed one of the list of specified impairments? 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Is the plaintiff unable to perform his occupation?; and (5) Is the plaintiff unable to perform any other work within the national economy? An affirmative answer at any step leads either to the next step or, at steps 3 and 5, to a finding of disability. A negative answer at any point leads to a determination that the Plaintiff is not disabled. *Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984).

▪ The Plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the Plaintiff shows an inability to perform past work, the burden shifts to the Secretary to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler,* 779 F.2d 1250, 1253 (7th Cir.1985); *Halvorsen v. Heckler,* 743 F.2d 1221 (7th Cir.1984).

▪ The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the court's own assessment of the evidence. The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Pitts v. Sullivan,* 923 F.2d 561 (7th Cir.1991). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls upon the Secretary (or the Secretary's designate, the ALJ)." *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir.1990) (quoting *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987)). Credibility findings made by the ALJ are entitled to considerable deference, and will be affirmed unless the claimant can show that they are "patently wrong." *Kelley v. Sullivan,* 890 F.2d 961, 965 (7th Cir.1989).

Upon review, the Court agrees with the ALJ's finding that, according to the regulations:

The claimant had the residual functional capacity between June 30, 1988, and September 22, 1989, to perform the exertional and nonexertional requirements of work except for lifting or carrying weight above the light exertional level; performing work requiring repetitive pushing or pulling; performing work requiring continuous stooping, twisting, or squatting; or performing work involving exposure to temperature or humidity extremes.

(A.R. 24). See, 20 C.F.R. § 404.1545.

▪ However, the Court finds that substantial evidence does not support the ALJ's finding that Plaintiff had a "limited education" according to the regulations. A "limited education" is defined as:

[A]bility in reasoning, arithmetic, and language skills, but not enough to allow a person with these qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade

through the 11th grade level of formal education is a limited education.

20 C.F.R. § 404.1564(b)(3).

The evidence indicates that Plaintiff did not have a "limited education." Although Plaintiff attended school through the 8th grade and for part of the 9th grade, Plaintiff's school attendance "was very poor" because he was frequently required to help his mother and father on their Arkansas farm. (A.R. 37, 79). Furthermore, Plaintiff apparently never developed any sophisticated math skills which would allow him to compute prices, use decimals, or figure percentages, as his wife was required to handle all of the family paperwork. The paperwork included the work which involved math skills such as tax preparations, filling out social security forms, check writing, and all other family business. (A.R. 84). Additionally, it is clear that Plaintiff's literacy skills were only marginal, as he never read a book, became confused by common punctuation marks, and could not understand certain words he heard on television. There was testimony that Plaintiff "read" the newspaper, but his wife testified that he "mainly [looked] at the newspaper," took "forever" to "read" the paper, and usually relied on her to tell him what was in the paper. (A.R. 83–84). Plaintiff's wife also testified that her son, who suffered from Downs Syndrome and functioned at a 3.8 grade level, had better reading and comprehension skills than Plaintiff. Upon review, the Court finds that Plaintiff's education was not sufficient to qualify as "limited" under the regulations, and his education would not serve him in more complex jobs requiring the reading and math skills of a hotel/motel clerk or order clerk.

▆ The Court also finds that Plaintiff did not acquire work skills in his past work as a truck driver which would be applied to meet the requirements of a hotel/motel clerk or an order clerk. The evidence showed that Plaintiff completed only a minimal amount of simple paperwork as a truck driver. This amounted to drawing lines through numbers to indicate the number of hours he worked each day. Plaintiff did not handle invoices or bills of lading and was not required to sign any papers, although he did ask someone to sign a delivery paper at a delivery site. (A.R. 57, 83). Clearly the simple paperwork skills Plaintiff acquired as a truck driver could not be useful in the more complex jobs of hotel/motel clerk and order clerk.

▆ Upon review of the record, the Court finds that the record, as a whole, does not support the ALJ's finding that Plaintiff had a "limited" education. Rather, the evidence indicates that Plaintiff had, at best, a "marginal" education as defined in the regulations.[1] Having found that substantial evidence does not exist to support the ALJ's conclusion that Plaintiff had a "limited" education under the regulations, which is the underpinning of the ALJ's determination that there were jobs in the national economy which Plaintiff could perform, the Court also finds that Plaintiff, with his physical limitations, could not have performed a significant number of jobs within the national economy. Accordingly, the Court finds that Plaintiff was under a disability from June 30, 1988 to September 22, 1989.

### CONCLUSION

For the above-stated reasons, the Court GRANTS Plaintiff's Motion for Summary Reversal of the Secretary's decision (# 7), and DENIES Defendant's Motion for Affirmance (# 10) and the decision of the ALJ is REVERSED. This matter is REMANDED to the Appeals Council for further proceedings not inconsistent with this opinion.

The Clerk of the Court is directed to enter judgment in favor of Plaintiff and against Defendant. Costs are awarded to Plaintiff. CASE TERMINATED.

---

**1.** A "marginal" education "means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." 20 C.F.R. § 404.1564(b)(2).